UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br>     v.<br>CARLOS ALBERTO NAVARRETE,<br><br>                Defendant. | Case No. 3:13-cr-00071-MMD-VPC<br><br>ORDER |

**I.    SUMMARY**

Defendant Carlos Alberto Navarrete is serving a 120-month sentence, followed by lifetime supervision, at the United States Penitentiary at Tucson ("USP Tucson") for sex trafficking of a minor. (ECF No. 45 at 2-3.) Before the Court is Navarrete's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) based on the "extraordinary and compelling reasons" presented by the COVID-19 pandemic[1] as applied to his health and particular circumstances.[2] (ECF No. 41 (the "Motion").) Because Navarrete is not receiving adequate treatment for his asthma at USP Tucson and suffers from hypertension—and as further explained below—the Court will grant his Motion.

**II.    BACKGROUND**

On November 20, 2013, Navarrete pled guilty to sex trafficking of a minor in violation of 18 U.S.C. § 1591(a)(1). (ECF Nos. 33, 35.) At the age of 21, Navarrete

---

[1]The Court issues this order during the COVID-19 pandemic, as a novel coronavirus ("COVID-19") is killing many people around the world, and many governments, including the governments of the United States and Nevada, have at least partially shut down their societies and economies in response.

[2]The government opposes his release. (ECF No. 45.) Navarrete filed a reply. (ECF No. 46.)

recruited and advertised a 16-year-old female on "myredbook.com." (ECF No. 33 at 3-4.) Navarrete arranged for the victim to engage in at least four commercial sex acts and retained a portion of the money she earned. (*Id.*) He was arrested after undercover detectives responded to the advertisement. (*Id.*) While the victim initially claimed to be 18, Navarrete admitted that he believed she was under the age of 18. (*Id.*) On February 24, 2014, the Court sentenced him to 120 months in prison, followed by lifetime supervised release. (ECF No. 35.)

At the time he filed his Motion, Navarrete had 22 months remaining on his 120-month sentence. (ECF Nos. 41 at 1, 45 at 3.) He has thus completed 82% of his custodial sentence. As noted, Navarrete seeks release because his preexisting medical conditions make him particularly vulnerable to COVID-19. (ECF No. 41.) Navarrete suffers from asthma and hypertension. (ECF No. 41 at 13.) The government does not dispute this medical history but opposes his Motion.

### III.   LEGAL STANDARD

Navarrete specifically seeks release under the compassionate release provision of 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act ("FSA") of 2018. (ECF No. 41 at 2.) This provision offers Navarrete a limited exception to the general rule that the Court may not modify or reduce the length of a sentence after the Court has imposed it. *See* 18 U.S.C. § 3582(c); *see also U.S. v. Penna*, 319 F.3d 509, 511 (9th Cir. 2003) (explaining that generally a court cannot modify a sentence after it has imposed it). "It allows the sentencing judge to reduce a sentence based on 'extraordinary and compelling reasons' after the defendant has asked the [Bureau of Prisons ("BOP")] to bring such a motion on her behalf and exhausted all administrative rights to appeal the BOP's denial of that request." *U.S. v. Mogavero*, Case No. 2:15-cr-74-JAD-NJK, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)(i)).[3] Moreover, before granting

---

[3] The government argues that the Court cannot reduce a statute-mandated minimum sentence. (ECF No. 45 at 5.) The Court disagrees. The Court reads § 3582(c) as granting broad authority to modify and reduce a sentence upon a showing of 'extraordinary and compelling reasons.' *See* 18 U.S.C. § 3582(c).

2

such a request, the Court "must consider the factors in 18 U.S.C. § 3553(a) 'to the extent that they are applicable,' and any sentence reduction must be 'consistent with applicable policy statements issued by the Sentencing Commission.'" *Id.* (citations omitted).

**IV.     DISCUSSION**

The Court follows a three-step process to evaluate the Motion. First, the Court determines if Navarrete has satisfied the statutory prerequisites under Section 3582(c)(1)(A). Then, the Court evaluates whether Navarrete has shown "extraordinary and compelling reasons" for the Court to release him under Section 3582(c)(1)(A)(i). Finally, the Court addresses the applicable policy statements and sentencing factors under Section 3582(c)(1)(A). Here, as there is no dispute regarding the first step, the Court will primarily address the latter two steps. Ultimately, the Court finds good cause exists to grant Navarrete's Motion.

**A.     Statutory Prerequisites**

Section 3582(c)(1)(A) requires that a defendant ask the BOP to bring a motion for compassionate release on the defendant's behalf before filing such a motion with a court, normally done by submitting a request to the warden. *See* 18 U.S.C. § 3582(c)(1)(A). In addition, a defendant may only bring a motion under Section 3582(c)(1)(A) "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" *Id.*

Navarrete submitted a letter to the Warden dated June 1, 2020 requesting compassionate release. (ECF No. 41-1 at 2-3.) On June 16, 2020, BOP rejected his request because Navarrete's health condition was "appropriately managed." (ECF Nos. 45 at 3, 41-1 at 2.) Navarrete has effectively exhausted his administrative remedies because the BOP has already determined his ineligibility for compassionate release. *See U.S. v. McGreggor*, Case No. 2:18-cv-244-JCM-DJA, 2020 WL 2308081, at *3 (D. Nev.

1  May 8, 2020) (holding that defendant exhausted his administrative remedies because the
2  BOP rejected his request and thus had already determined he was ineligible for release).

### B.    Extraordinary and Compelling Reasons

Having found Navarrete has satisfied the statutory prerequisites, the Court moves on to the merits of the Motion.

To prevail on the "extraordinary and compelling reasons" prong of the analysis, Navarrete must establish: (1) the combination of his age and underlying health conditions elevate his risk of becoming seriously ill were he to contract COVID-19 (the "Underlying Health Conditions Prong"); and (2) he faces greater risk from COVID-19 if he continues to be housed at his current facility instead of being released (the "Location Prong"). *See, e.g., U.S. v Kauwe* Case No. 3:14-cr-00044-MMD-WGC, ECF No. 568 at 4 (D. Nev. Aug. 10, 2020).

#### i.    Underlying Health Conditions Prong

The parties dispute whether Navarrete's medical conditions put him at a high risk of COVID-19 complications or contracting a severe case of COVID-19. (ECF Nos. 41 at 1, 45 at 1-2.) Under current Centers for Disease Control ("CDC") guidance, each of Navarrete's underlying health conditions 'may' increase his risk of contracting a severe case of COVID-19, or result in complications. But Navarrete argues that the combination of his poorly treated asthma and hypertension add up to extraordinary and compelling reasons to grant the Motion. (ECF No. 41 at 13.) The government counters that because both factors only 'may' place him at high risk, he cannot establish extraordinary and compelling reasons. (ECF No. 45 at 9-10.) The Court finds that although each factor *alone* only 'may' increase risk, the combination of his conditions results in extraordinary and compelling reasons for granting the Motion.

First, Navarrete suffers from asthma, and his risk from asthma is compounded by a lack of proper treatment. The parties agree Navarrete suffers from "acute" asthma.[4]

---

[4] BOP medical staff diagnosed Navarrete with "Asthma, unspecified, with (acute) exacerbation." (ECF No. 42 (sealed) at 7.) Both parties refer to Navarrete's asthma as "acute." (ECF Nos. 41 at 13, 45 at 9.) According to the CDC, "asthma severity is the

4

Further, Navarrete no longer receives his weekly nebulizer treatments, but was provided with an inhaler. (ECF Nos. 41-3 at 4, 42 (sealed) at 7, 46 at 3.) After repeated requests for additional treatment, he reports heaviness in his chest, difficulty breathing, and no relief even after using an inhaler five times daily. (ECF No. 41-3 at 2.) According to the CDC, lack of access to necessary treatment increases risk of COVID-19 complications. The CDC's web page providing guidance for patients with asthma (the "CDC Asthma Page") says, "people with moderate to severe asthma, particularly if not well controlled, might be at a higher risk of getting very sick from COVID-19. . . . Patients with asthma but without symptoms or a diagnosis of COVID-19 should continue any required nebulizer treatments." CDC, *Patients With Asthma*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Patients-with-Asthma (last visited Sept. 23, 2020). In sum, Navarrete does not merely suffer from asthma. He suffers from acute asthma that is not properly treated, which weighs in favor of finding extraordinary and compelling circumstances.

Furthermore, Navarrete suffers from hypertension. The CDC's revised guidance on hypertension, issued June 25, 2020, says that "people whose only underlying medical condition is hypertension might be at increased risk for severe illness from COVID-19." CDC, *Patients With Hypertension*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Patients-with-Hypertension (last visited Sept. 23, 2020) (footnotes omitted).

Navarrete thus has two medical conditions that might place him at a higher risk for COVID-19. The Court finds persuasive the discussion of hypertension in *U.S. v. Salvagno*, Case No. 5:02-CR-51 (LEK), --- F.Supp.3d ----, 2020 WL 3410601 (N.D.N.Y. Apr. 23, 2020), *reconsideration denied* (June 22, 2020), and the discussion of asthma in *U.S. v. Gorai*, Case No. 2:18-cr-220-JCM-CWH, 2020 WL 1975372 (D. Nev. Apr. 24,

---

inherent intensity of the disease . . . [and] depends on whether the individual is treated or not and how well the individual responds to treatment." CDC, *Asthma Severity Among Adults with Current Asthma*, https://www.cdc.gov/asthma/asthma_stats/severity_adult.htm, (last visited Sept. 22, 2020). Thus, the distinction between acute, moderate, and severe asthma is a function of its intensity and treatment.

2020). In those two cases, hypertension or asthma alone were sufficient to satisfy the "extraordinary and compelling reasons" prong. *See Salvagno*, 2020 WL 3410601, at *12-17; *see also Gorai*, 2020 WL 1975372, at *2-3. If hypertension or asthma alone were enough for the courts in *Gorai* and *Salvagno*, that weighs in favor of the Court finding that the combination of Navarrete's asthma and hypertension places him at an increased risk of experiencing severe complications from COVID-19. Logically, having two risk factors (and one that is compounded by improper medical care) increases one's risk of experiencing severe complications. In fact, the CDC's web page providing guidance for patients with hypertension states that "people whose only underlying medical condition is hypertension might be at increased risk for severe illness from COVID-19[,]" suggesting that people with both hypertension and another underlying medical condition would be at even higher risk.[5]

Finally, and contrary to the government's argument, Navarrete's age (28) does not determinatively weigh against finding the Underlying Health Conditions Prong favors granting his Motion. The government argues that "his youth places him well within the category of individuals where good outcomes from COVID-19 infections are the norm and expected." (ECF No. 45 at 10.) But while the CDC guidelines state that "as you get older your risk for severe illness from COVID-19 increases," it also notes that "there are also other factors that can increase your risk for severe illness." CDC, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Sept. 23, 2020). In fact, the CDC website itself places those of increased risk into two categories: "Older Adults" and "People with Medical Conditions." *See* CDC, *People at Increased Risk*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Sept. 23, 2020). While old age would certainly further increase Navarrete's risk, his medical conditions alone are sufficient to place him at an

---

[5]CDC, *Patients With Hypertension*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Patients-with-Hypertension (last visited Sept. 23, 2020) (footnotes omitted).

increased risk.[6] The Underlying Health Conditions Prong of the analysis thus weighs in favor of granting the Motion.

### ii. Location Prong

Turning to the next prong, the government contends that USP Tucson does not "bespeak of any outbreak," citing four known cases, and pointing to BOP's response plan—including additional COVID-19 screening measures—as evidence of mitigation of the virus. (ECF No. 45 at 8.) The government maintains that nothing about the conditions in USP Tucson "as to *this defendant*" indicate significant issues. (*Id.* (emphasis in original).) Navarrete responds that the number of cases is irrelevant if mass testing is not occurring. (ECF No. 46 at 3.) The Court agrees with Navarrete.

Although the Court commends the BOP for taking additional screening measures, these practices cannot detect asymptomatic individuals, particularly if adequate testing measures are not in place. The risk is compounded by the fact that prison staff continue to circulate in and out of the facility every day, in an area with increasing numbers of COVID-19 cases. According to the CDC, Arizona ranks 7th in total COVID-19 cases, with over 214,000. *See* CDC, *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#cases_totalcases (last visited Sept. 23, 2020).

Moreover, while the Court agrees with the government that the presence of any COVID-19-positive inmates in a particular facility does not necessarily merit a finding of extraordinary and compelling reasons as to a particular defendant, the Court finds that remaining at USP Tucson places Navarrete at individualized risk. According to the Health Resources and Services Administration ("HRSA"), USP Tucson is designated as a Healthcare Provider Shortage Area ("HPSA"). *See* HRSA, *HPSA Find*,

---

[6]The CDC website says, "people of any age with certain underlying medical conditions are at an increased risk." CDC, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Sept. 23, 2020). As noted, those conditions include asthma and hypertension. *See id.*

https://data.hrsa.gov/tools/shortage-area/hpsa-find (last visited Sept. 23, 2020) (select "Arizona" from dropdown; then check "Primary Care"; then check "Designated" for HPSA Discipline; then click "submit").[7] Arizona also ranks ninth in the nation for the most HPSAs. *See* HRSA, *Shortage Areas*, https://data.hrsa.gov/topics/health-workforce/shortage-areas (last visited Sept. 23, 2020). FCC Tucson—the federal prison facility encompassing USP Tucson—is located within one of the top three shortage areas in the state.[8] In sum, USP Tucson has a known healthcare shortage. This is relevant both to help explain USP Tucson's low COVID-19 testing numbers, and sheds light on Navarrete's inability to receive necessary treatments for his acute asthma. Thus, the Court finds conditions at USP Tucson are dangerous enough—from a COVID-19 exposure perspective—to weigh in favor of granting Navarrete's Motion.

The Court therefore finds extraordinary and compelling reasons exist to grant the Motion. Accordingly, the Court moves onto the third and final step of the analysis.

### C.  Section 3553(a) Factors

The Court must next consider the factors set forth in Section 3553(a) to the extent they are applicable. These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established in the Sentencing Guidelines; (5) any pertinent policy statement issued by the Sentencing Commission;[9] (6) the need to avoid unwarranted

---

[7]HRSA designates areas as HSPAs when they have a lack of healthcare providers and services. *See* HRSA, *What is a Shortage Designation?*, https://bhw.hrsa.gov/shortage-designation/what-is-shortage-designation (last visited Sept. 22, 2020).

[8]HRSA, *HPSA Find*, https://data.hrsa.gov/tools/shortage-area/hpsa-find (last visited Sept. 22, 2020) (select "Arizona" from dropdown; then check "Primary Care;" then check "Designated" for HPSA Discipline; then click "submit;" then search for FCC Tucson). HPSAs are ranked from zero to 26, with 26 measuring the worse shortage. FCC Tucson is one of three areas in Arizona ranking 21.

[9]Because the Sentencing Commission never released guidelines with respect to compassionate release under the FSA, Section 3553(a)(5)'s pertinent policy statement factor is neutral. *See U.S. v. Regas,* Case No. 3:91-cr-57-MMD-NA-1, 2020 WL 2926457, at *4 n.7 (D. Nev. June 3, 2020) (citation omitted).

8


sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims. *See* 18 U.S.C. § 3553(a)(1)-(7). As to the Section 3553(a)(2) factor, the need for a sentence must be sufficient, but not greater than necessary, to serve the purpose of "just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017) (citation and internal quotation marks omitted).

The government argues that the Section 3553(a) factors weigh against granting the Motion because Navarrete's conduct was "very serious" and he continues to present danger to the community. (ECF No. 45 at 6.) While the Court agrees with the government regarding the seriousness of Navarrete's crime, the government failed to address additional factors raised by Navarrete in his Motion that favor release.

In contrast, the factors raised by Navarrete—and not really addressed by the government—tend to convince the Court his Motion should be granted. First, Navarrete has already served 82% of his 120-month sentence. (ECF Nos. 41 at 1, 45 at 3.) Second, the incident for which he was sentenced was short in duration, and not repeated with others. (ECF No. 46 at 4.) His act was also nonviolent. (*Id.*) Third, Navarrete has no prior adult or juvenile criminal history. (ECF No. 41 at 14.) Fourth, Navarrete was sentenced to lifetime supervision, so he will continue to be supervised upon release. (*Id.*) Fifth, Navarrete was only 21 years old at the time of the incident and has served 25% of his life in custody. (*Id.*) Sixth, Navarrete has participated in all the rehabilitation and counseling classes available to him. (ECF No. 46 at 4.) In-custody classes are currently cancelled because of COVID-19, but were he to be released, Navarrete could continue to receive counseling and classes virtually. (*Id.*) Seventh, he has no cited history of mental health issues. Eighth, Navarrete has a release plan. (ECF No. 41 at 14.) He plans to reside in his father's home in Stockton, California, with his own room and bathroom. (*Id.*) Ninth, Navarrete has an abundance of family and friend support, as evidenced by his release

plan. (*Id.*) Finally, Navarrete has been a model prisoner, with no cited disciplinary record while in custody.

Taken together, these factors persuade the Court that ordering Navarrete's release aligns with the factors in Section 3553(a). While Navarrete's offense was serious, he has sufficiently demonstrated he is at a low risk of recidivism, and his already-imposed period of lifetime supervision will sufficiently address the Court's need to protect the public.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion before the Court.

It is therefore ordered that Navarrete's motion for compassionate release (ECF No. 41) is granted.

It is further ordered that Navarrete is compassionately released with credit for time served, followed by a lifetime of supervised release. Navarrete will be released after he has been in quarantine for a period of 14 days. The Court directs the Probation Department to ensure an assessment is made that Navarrete's proposed release plan to reside with his father, Jamie Navarrete, during supervised release is appropriate.

DATED THIS 25th Day of September 2020.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE